[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
By petition filed on November 3, 1989 and amended on September 13, 1990, the Commissioner of the Department of Children and Youth Services (hereinafter DCYS) seeks to terminate the parental rights of Barbara Frangione in and to her daughter, Lauren, born on January 7, 1987. No father has been named and none has acknowledged paternity of Lauren. The CT Page 2149 petition has been filed pursuant to General Statutes 17-43a whereby the court has jurisdiction with respect to any child committed to DCYS in accordance with General Statutes 45b-129(d). Lauren was adjudicated as a neglected child on November 30, 1988 and on that date, she was committed to DCYS for a period of eighteen months. On March 1, 1990, the petition for extension of commitment was granted by agreement; on June 7, 1990, a continuance of three months was granted.
The instant petition requests a termination of the parental rights in the best interests of the child and upon the following statutory grounds for a period of not less than one year as required by 17-43a(b):
1. The child has been found in a prior proceeding to have been neglected or uncared for, and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child.
2. The child has been denied by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for her physical, educational, moral or emotional well-being.
Before proceeding to the merits of these cases, it is worthwhile to discuss the procedure in termination actions. A petition to terminate parental rights consists of two phases, adjudicatory and dispositive. Practice Book 1049, 1042, 1044. There is, however, no requirement that the adjudicatory and dispositive phases be the subject of separate hearings.
A unified trial, such as was held in this case. is permissible. In re Juvenile Appeal (84-AB, 192 Conn. 254, 259
(1984); State v. Anonymous, 179 Conn. 155, 172 (1979).
Although a unified trial is permitted, the two phases serve different purposes. In the adjudicatory phase, the court hears and receives evidence to determine the validity of the allegations made in the petitions and hence, it is limited to events that preceded the filing of the petition as amended. The dispositive phase is concerned with what action should be taken in the best interests of the child and the court can extend its consideration to events occurring until the end of the trial. To prevail on the adjudicatory phase, DCYS must establish the existence of at least one of the alleged statutory grounds by clear and convincing evidence. Conn. Gen. Stat. 17-43a(b). To prevail on the petition, only one of the grounds alleged must be proved. In re Juvenile Appeal, 1 Conn. App. 463, (Cert. CT Page 2150 denied,) 193 Conn. 802 (1984).
From the credible testimonial and documentary evidence, the court finds the facts set forth below as relevant to the adjudicatory phase of the petitions by clear and convincing evidence. Some further factual findings appear, where appropriate, in subsequent portions of this memorandum.
Lauren Frangione was born to Barbara Frangione in Stamford, Connecticut on January 7, 1987; no one was named as the father of the child. She first came into the care of the Department of Children and Youth Services ("DCYS") pursuant to an Order of Temporary Custody on December 4, 1987, when Lauren was placed in foster care and the Order of Temporary Custody continued in effect until November 30, 1988. At that time Lauren was adjudicated uncared for and committed to the custody of DCYS for eighteen months. The child remained in the hospital for one month after birth as she was suffering from cocaine withdrawal. The mother admitted to using cocaine prior to delivery. In August, 1987 and November, 1987, DCYS received referrals concerning Lauren and in November, 1987, the mother was arrested on risk of injury charges.
During the period from November 30, 1988, the mother was granted liberal visitation with the child; the grandmother was also granted visitation rights. Ms. Frangione saw Lauren when the child was visiting with her grandmother. Also during this period, Barbara Frangione made several unsuccessful and aborted attempts at drug treatment programs at Drug Liberation, Fairfield Hills Hospital Detox Program and Crossroads.
DCYS worked extensively with the mother and drug programs to facilitate the mother's admission into a drug program. In January, 1988, the court ordered the mother into detox and then Crossroads and she entered the Crossroads program on February 4, 1988. On March 9, 1988, the court vacated the OTC effective March 21, 1988, so the child could be placed with her mother at Crossroads. The program at Crossroads is an in-patient drug program that requires a minimum of six (6) months to one (1) year stay. The mother was discharged from Crossroads on March 29, 1988, for non-compliance with the program and made no contact with DCYS until June, 1988.
Lauren was returned to foster care by a voluntary permission to place signed by the mother, on March 29, 1988.
Ms. Frangione participated in an out-patient drug program at Connecticut Counseling Center, from September 14, 1988 to October 24, 1988 and was discharged with the recommendation for long-term in-patient hospitalization, but she did not follow CT Page 2151 that recommendation.
On November 30, 1988, Lauren was adjudicated and committed to DCYS. The neglect petition has continued for one year from the original filing date so that the mother could enter and successfully complete a drug program; the mother failed to successfully complete any drug program. During this period, DCYS permitted liberal and unsupervised visitation between Lauren and her grandmother, during which time the mother could see her child.
From January 23, 1989 to February 22, 1989, the mother was evaluated by Drug Liberation; an in-patient drug program was recommended at Berkshire Woods, but the mother did not follow the recommendation.
For a period of approximately five months after the November 1988 commitment, the mother did not contact DCYS.
In April 1989, the mother was in detox at Fairfield Hills Hospital and again entered Crossroads for drug treatment on April 11, 1989. The social worker, Melissa Murphy, met with the mother at crossroads on April 21, 1989, when a social service agreement was signed which detailed the requirements for the mother to meet to have Lauren returned to her. Basically, the mother was required to successfully complete the Crossroads program. However, on May 12, 1989, the mother was discharged from Crossroads for non-compliance with the program and she failed to comply with the social service agreement. On June 15, 1989, the mother attended a treatment plan review when the facilitator clearly detailed the requirements with which the mother had to comply, but she failed to satisfy the requirements.
Thereafter, the mother failed to maintain contact with DCYS. The mother was incarcerated at Niantic from August 29, 1989 to November 28, 1989.
DCYS filed the petition for termination of parental rights on November 3, 1989. The mother did not appear in court on November 30, 1989, December 14, 1989 or January 4, 1990. The mother first appeared in court on February 8, 1990, when she requested a psychological evaluation and parent-child interaction study. On March 1, 1990, the court granted the petition for extension of commitment. DCYS arranged for, and transported the parties to Dr. Grant for the court ordered evaluations on April 11, 1990. The mother failed to maintain contact with DCYS and did not respond to letters from the social workers. On June 7, 1990, a final continuance was granted. The mother was ordered to cooperate with DCYS, find a job, engage in CT Page 2152 therapy, participate in a drug program and remain drug free, and to comply with the social service agreement. The mother did not obey the order. On June 19, 1990, the mother was arrested for possession of narcotics and was again incarcerated at Niantic from June 20, 1990 to July 30, 1990.
On August 22, 1990, the State amended the TPR petition. The motion to amend the TPR petition was granted on September 13, 1990. termination of parental rights trial was conducted on 9/13/90, 9/14/90, 10/4/90, and 10/12/90.
The mother has not participated in a drug program since her discharge from Crossroads on May 12, 1989. She has been accepted at Crossroads again, for a third admission. The witness from Crossroads could not provide any assurances upon which the court could rely that the mother would successfully complete the program.
Dr. Grant testified that although there was a relationship between Lauren and her mother, this relationship was not sufficient to deprive Lauren of a permanent home. Dr. Grant testified that earlier she wanted to give the mother an additional three months for her to rehabilitate; she was given the three months, but to no avail. Dr. Grant testified that it was now time to focus on Lauren's needs. Dr. Grant testified that, in her opinion, there should be a termination of parental rights, and that termination would be in Lauren's best interests.
Lauren is identified as a special needs child and is currently in a special education program. She has a strong and close relationship with her foster parents whom she calls "mommy" or "daddy". She refers to her mother as "mommy Barbara".
Connecticut General Statutes 17-43a sets forth the grounds for termination of parental rights where there is no voluntary consent to the termination. The petition in this case states that the grounds are: (1) that the child is committed to DCYS as uncared for in a prior proceeding; (2) the parent has failed to achieve such degree of personal rehabilitation which would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child; (3) the child has been denied by reasons of omission or commission the care, guidance or control necessary for his physical, educational, moral or emotional well-being, and (4) these conditions have existed for not less than one year.
Before the court can grant the petition it must find, upon clear and convincing evidence, that termination is in the best interests of the child and that one or more of the above CT Page 2153 conditions has existed for not less than one year.
"Clear and convincing evidence", the required level of proof in termination cases, has been described in both quantitative and qualitative terms. For example, clear and convincing evidence has been defined as a level of persuasion lying between the usual civil requirement of proof by a fair preponderance of the evidence and the requirement in criminal cases of proof beyond a reasonable doubt. Cookson v. Cookson,201 Conn. 229, 234 (1986). Another and more qualitative definition is that clear and convincing evidence is a level of proof that is sufficient to satisfy a court beyond an average certainty. In re Juvenile Appeal (84-3), 1 Conn. App. 463, 468, cert. denied 193 Conn. 804 (1984).
As previously indicated, a petition for termination of parental rights consists of two phases: the adjudicatory phase and the dispositional phase. Connecticut Practice Book 1042, 1044 and 1059. There is no requirement that these two phases be the subject of separate hearings, and a unified trial, such as the one held in this case, is permissible. In re Juvenile Appeal, 192 Conn. 254, 259 (1984); State v. Anonymous, 179 Conn. 155,172 (1979).
The two phases serve different purposes. In the adjudicatory phase, the court determines the validity of the allegations made in the petition and is limited to the events that occurred prior to the filing of the amended petition. The grounds alleged must be proved by clear and convincing evidence. In re Juvenile Appeal, 3 C.A. 184 (1985). The petitioner is required to prove only one of the grounds alleged by clear and convincing evidence. In re Juvenile Appeal, 1 C.A. 463, cert. denied, 193 C. 802 (1984).
Since the dispositional phase relates to the best interest of the child, the court can take into consideration events that have occurred to the time of the TPR trial.
The first ground asserted for termination of parental rights is that the child has been found in a prior proceeding to have been neglected or uncared for, and that the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. Conn. Gen. Stat. 17-43a(b)(2).
Lauren was adjudicated and committed to DCYS on November 30, 1988. Prior to that date, she was in the temporary custody of DCYS from December 4, 1987. She remained in foster care since CT Page 2154 December, 1987, except for a one-week period in 1988.
The phrase "`personal rehabilitation' refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Rayna M., Conn. App. 23, 32 (1987); In re Migdalia M., 6 Conn. App. 194, 203, cert. denied,199 Conn. 809 (1986); In re Shannon S., 41 Conn. Sup. 145, 153, per curiam aff'd. 19 Conn. App. 20 (1989).
Since the time of commitment, Barbara Frangione has done nothing to rehabilitate herself. Lauren was removed from the mother's care because of her drug abuse. Since then, she has failed to comply with service agreements; she has failed to successfully enter and complete any drug program; she has failed to maintain regular and consistent contact with DCYS; she has failed to advise DCYS of her whereabouts; she has failed to provide a home for for her child; she has failed to come forward with a plan for her child's return and she has failed to be a parent in any sense of the word.
The mother, since Lauren's placement in care, has been discharged a number of times from drug programs for non-compliance for failure to follow through with recommended treatment. She has been incarcerated twice and has failed to abide by the terms of post-commitment service agreements, as well as specific court orders. Failure to abide by such agreements or orders, under the circumstances, provides cogent evidence of the mother's unwillingness or ability to change. In re Shannon S.,41 Conn. Sup. 145, 155 91989); aff'd., 19 Conn. App. 20 (1989).
Similarly, "incarceration is an item for assessment in the total picture. . . . Another definition of `rehabilitate' is the restoration of a person to a useful and constructive position in society through social rehabilitation." In re Shannon S., ibid.
The mother has failed to provide to the court any evidence of successful drug treatment, lawful employment, stable housing, drug rehabilitation or any evidence that she is now in a position to assume a responsible role in her child's life.
"As presently written, the statutory ground for termination provided by a parent's failure to rehabilitate with its emphasis on `a reasonable time' and `the age and needs of the child' came into existence as a result of amendments to 17-43a(b)(2) effective October 1, 1983. . . . The general effect of the legislative changes is a shortening of the time period in which a parent's rehabilitation may be achieved. That is a reasonable time is invariably a question of fact to be governed by attendant circumstances." In re Shannon S., ibid. Clearly, the mother has failed to rehabilitate within a reasonable time. CT Page 2155
The age and needs of the child must be considered in determining the failure to rehabilitate.
Lauren, who is now more than four years old, was placed in foster care when she was eleven months old. She has been in foster care three years. She is a special needs child and has absolutely no more time to sacrifice for a mother who, in those three years, has not done enough to rehabilitate and change her life.
The court finds that the petitioner has proven by clear and convincing evidence that the parent has failed to rehabilitate herself as provided in the statute.
The petitioner alleges that Lauren has been denied by reason of act or acts of commission or omission by the mother the care, guidance or control necessary for her physical, educational, moral or emotional well-being. Conn. Gen. Stat. 17-43a(b)(3).
Lauren was born testing positive for cocaine and she had to remain in the hospital for one month to withdraw from the drug. The mother admitted to drug use prior to delivery. Lauren was discharged to her mother's care and DCYS received two referrals from the Darien police concerning Lauren. The second one resulted in the mother's arrest in December 1987.
Since Lauren's placement in care, the mother has not been a parent to Lauren. She has not provided a home for her has not acknowledged her with gifts or cards on birthdays and holidays, has not provided her with any necessaries, has not maintained regular contact with either DCYS or her foster family and has not changed her lifestyle in any way to accommodate Lauren.
The same evidence, facts and circumstances that support the ground of failure to rehabilitate, also support this ground of acts of parental commission and omission, and the same evidence "certainly can establish more than one ground for termination." In re Shannon S., ibid. 159.
The court finds that the petitioner has proven, by clear and convincing evidence, that Lauren has been denied by acts of commission or omission, the care, guidance and control necessary for her well-being.
Finally, it is clear and convincing that these conditions have existed for more than a year.
If the court determines that grounds exist for the CT Page 2156 termination of parental rights, it then goes on to determine whether there is clear and convincing evidence whether it will be in the best interest of the child to terminate parental rights. In re Juvenile Appeal (84-AB), supra 267; In re Christine F.,6 Conn. App. 360, 363, n. ; 17-43a-(b), Connecticut General Statutes. In order to determine if the termination of parental rights is in the best interest of the child under the statute, the court is required to consider and make written findings on the six factors contained in 17-43a(d). In re Christine F., supra 363 n. , 367. A finding that a statutory ground for termination has been established does not automatically require the termination of parental rights there must also be proof by clear and convincing evidence that such termination is in the best interest of the child. Since complete severance by court order of the legal relationship, with all its rights and responsibilities between the child and the parent is a most serious and sensitive judicial action, the natural rights of parents and their children are to be given deference and, absent a powerful countervailing interest, protection. In re Juvenile Appeal (Anonymous), 181 Conn. 638, 640. As previously mentioned, the court in the dispositive phase can consider facts and events occurring after the filing of the petitions and until the end of the trial.
Connecticut General Statutes 17-43a(d) states that in determining whether to terminate parental rights the court shall consider and make written findings regarding: (1) the timeliness, nature and extent of services offered or provided to the parent and child to facilitate reunion of child with parent; (2) the terms of any applicable court order entered into and agreed upon by the agency and the parent and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child to the parent, guardian and any other person who has cared for the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of the effort to reunite parent and child, provided the court may give weight to incidental visitation, communications, or contributions and (B) the maintenance of regular contact or communications with the child's guardian, and (6) the extent to which the parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child or any other person, or economic circumstances of the parent. CT Page 2157
1. C.G.S. 17-43a(d)(1). In considering the timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent, the court finds the following by clear and convincing evidence by the credible testimony: that DCYS initially received a referral in this matter when Lauren was first born. The intake social worker made numerous home visits and finally met with the mother on January 28, 1987. The worker discussed the substance abuse parent support group with the mother and encouraged her to continue treatment at Liberation House. At the time, the mother was not in treatment at Liberation House. The worker also offered parent aid services or parenting classes, but the mother declined the offer. The child was released to her mother's care on February 7, 1987 and DCYS closed its file.
After DCYS received a referral from the Darien Police on August 10, 1987 concerning Lauren having been left alone with two other children in a motel room, DCYS responded by contacting the mother, but the mother and child disappeared before services could be put in place.
The third referral was made on November 27, 1987 by the Darien Police when the mother was arrested on risk of injury charges and the mother signed a voluntary permission to place the child in December, 1987. In OTC was signed on December a, 1987 and DCYS filed a neglect petition. At the OTC hearing on December 9, 1987, DCYS was to provide supervised visits and the mother's need for drug treatment was acknowledged.
DCYS provided visitation between the mother and Lauren; and DCYS contacted numerous drug programs for the mother. DCYS arranged for an overnight Christmas, 1987 visit for Lauren with her grandmother.
In order to assist the mother in entering a detox program at Fairfield Hills, the court, on January 6, 1988, issued orders for such a program and DCYS arranged for the interviews and transportation to Crossroads. DCYS made contact with Crossroads to effectuate the mother's placement. The mother entered crossroads on February 4, 1988. The court vacated the OTC on March 9, 1988, to be effective March 31, 1988, when Lauren was to be placed with her mother at Crossroads, and the neglect petition was continued for 60 days to give the mother a chance to remain in the program.
The social worker transported Lauren to Crossroads on March 21, 1988 to reside with her mother, and on March 28, 1988, Ms. Frangione was discharged from Crossroads for non-compliance with the program. CT Page 2158
Lauren was returned to foster care pursuant to a voluntary permission to place. The mother did not contact DCYS from March 29, 1988 until June 7, 1988. However, Lauren continued to visit with her grandmother on weekends. The grandmother refused to be a placement resource for Lauren.
On June 14, 1988, the neglect matter was back in court, and again the case was continued for 90 days, because the mother claimed she was in a day treatment program and that she had a place to live. The mother was required to verify this information, and if she did, weekly visitations would commence with the idea of returning Lauren to her mother's care at the end of 90 days.
The worker made a home visit to Ms. Frangione's apartment in Norwalk and attempted to verify her enrollment in the drug treatment program at Norwalk Hospital. The mother, in fact, did not enter the treatment program at Norwalk Hospital. The social worker in August, 1988 encouraged the mother to enter a drug program. Weekend visits with the grandmother continued, and Lauren did see her mother at the grandmother's home. In court on September 14, 1988 a trial date was set for October 19, 1988 and the mother claimed to have entered the drug program at Connecticut Counseling Center. On October 19, 1988, the court issued an OTC by agreement, scheduled a trial date for November 30, 1988 and ordered that the mother visit with the child at the grandmother's house.
On October 24, 1988, the mother was discharged from Connecticut Counseling Center.
On November 30, 1988, Lauren was adjudicated and committed to DCYS, by agreement, and visitation was to continue at the grandmother's home.
The court finds that DCYS made every effort, from December, 1987 to the date of the commitment to prevent the need for the commitment.
After Lauren was committed to DCYS, the mother disappeared for over four months. She did not maintain contact with the agency. In April 1989, DCYS learned that the mother was in a detox program at Fairfield Hills Hospital and was to enter Crossroads on April 11, 1989. The social worker met with the mother at Crossroads on April 21, 1989. The social worker set up a visit at Crossroads between Lauren and her mother, but the mother was discharged on May 12, 1989 for non-compliance prior to the visit taking place. The social worker also prepared and presented a social service agreement for the mother on April 21, CT Page 2159 1989. The mother was required to complete the program at Crossroads, which she failed to do.
The worker then spoke to the mother in May, 1989 and advised her to call DCYS weekly. The agency had no address for the mother, nor did she appear in court on May 18, 1989.
On June 15, 1989 the mother attended an administrative review where the DCYS facilitator spelled out in detail the requirements for the mother to demonstrate her sincerity in having Lauren returned to her. The mother was also to call DCYS once a week. The mother did not contact DCYS after that meeting, nor did she comply with any of the requirements. Instead, the mother was incarcerated at Niantic from August 29, 1989 to November 28, 1989. DCYS filed the TPR petitions on November 3, 1989. The mother failed to appear in court on November 30, 1989. She failed to attend the administrative review on December 5, 1989. The mother did not appear in court on December 14, 1989 or January 4, 1990.
In December, 1989, DCYS again met with the grandmother to give the grandmother another opportunity to offer an alternative plan for Lauren. The grandmother in January, 1990, proposed some family members, and DCYS began the investigation, but the family members in April, 1990 indicated that they were no longer available for Lauren.
The mother was notified of, and failed to attend, the treatment plan scheduled for January 30, 1990. The mother did appear in court on February 8, 1990. The mother requested a parent-child assessment and psychological evaluation. DCYS arranged for the evaluations and transported both Lauren and Barbara to the evaluations on April 11, 1990.
On March 1, 1990, in court, the mother agreed to an extension of commitment, and the social worker again encouraged the mother to maintain weekly contact with her. The mother failed to maintain regular contact with DCYS and the social worker sent her several letters in May, 1990, suggesting services to the mother as recommended by the psychologist, Dr. Grant. DCYS received no response from the mother.
On August 16, 1990, DCYS again offered assistance with visits, and the worker again told the mother to call weekly. The trial began on September 13, 1990, and the mother had not complied with any of the orders from June 7, 1990, nor did she maintain contact with DCYC.
The credible testimony compels the court to find the facts stated above by clear and convincing evidence. CT Page 2160
2. C.G.S. 17-43a(d)(2). In considering the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their obligations under such order, the court finds clearly and convincingly by the credible evidence:
That, on January 6, 1988, the court ordered the mother into detox at Fairfield Hills Hospital and then into Crossroads and DCYS was to arrange the interviews and transportation. The mother did enter the detox program and did enter Crossroads. DCYS made the arrangements.
On March 9, 1988 the court vacated the OTC, effective March 21, 1988 and Lauren was to be returned to the mother at Crossroads. This occurred as planned, except that Lauren came back into care on March 29, 1988.
On June 14, 1988, the neglect petition was continued for 90 days and the mother was to verify her living arrangements and verify her participation in a drug program. The mother did not enter or verify participation in a drug program. At the commitment hearing on November 30, 1988, the court ordered reasonable and liberal visitation between Lauren and her mother and grandmother. Lauren continued to visit with her grandmother.
On February 8, 1990 the court ordered a parent-child assessment and a psychological evaluation of the mother. DCYS arranged for these evaluations and transported the parties.
On June 7, 1990 the court ordered a final 3-month continuance and ordered the mother to find a job, engage in therapy, participate in a drug program and remain drug-free, cooperate with DCYS, cooperate with supervised visits and comply with a social service agreement. The mother did not find a job; did not engage in therapy; did not participate in a drug program; did not remain drug-free; did not cooperate with DCYS and was not available to engage in a social service agreement. On October 12, 1990, the last day of trial, the mother was awaiting entry into a detox program, indicating that she was not drug-free even on that date.
3. C.G.S. 17-43a-(d)(3). In considering the feelings and emotional ties of the child with respect to is parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom such child has developed significant emotional ties, the court finds clearly and convincingly by the credible evidence: that Lauren has been with her current foster family CT Page 2161 for almost three years. She refers to them as "mommy" and "daddy", and has a strong, loving relationship with them.
Lauren referred to her natural mother as "Barbara" until the court-ordered evaluation, when she began referring to her as "mommy-Barbara."
Lauren is an affectionate child and displays affection to adults. She does not spontaneously talk about her natural mother in the foster home, but did say that "mommy-Barbara" is in jail.
Dr. Grant testified that Lauren appeared bonded to her mother, and that she was an extremely affectionate and open child, who needs to be with stable parents. Dr. Grant testified that, with each passing day, Lauren loses the ability to bond to such a set of stable parents, and that if the choice is between leaving Lauren in foster care to enable her to see her mother on visits or sever that relationship and free her for adoption, the choice must be for adoption.
The social worker, foster mother and Dr. Grant all testified that Lauren is an adoptable child, and that a family can be found for her. Dr. Grant, the foster mother, and the social worker all agreed with the extreme importance of providing Lauren with a permanent and stable home as soon as possible, and that she had spent about three years in foster care and she had no more time or life to waste.
4. C.G.S. 17-43a(d)(4). The age of the child. Lauren was born on January 7, 1987. She is now more than four years old. She has lived away from her biological mother since December 2, 1987, when she was eleven months old. She has now spent more than three years in foster care. These years have been difficult for her and the time has come to attain consistent parenting in a permanent home, as recommended by Dr. Grant.
5. C.G.S. 17-43a(d)(5). In considering the efforts the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and; (B) the maintenance of regular contact or communication with the guardian or other custodian of the child, the court finds clearly and convincingly that the mother from the time Lauren was placed in care, never rehabilitated her drug problem, which CT Page 2162 was the primary reason for Lauren's removal.
Ms. Frangione was discharged from Crossroads for non-compliance with the program on March 29, 1988, one week after Lauren was returned to her care. The mother was discharged from Connecticut Counseling Services after 5 weeks, on October 24, 1988, for non-compliance with the program.
She was re-assessed at Drug Liberation from January 23, 1989 to February 22, 1989 and was referred to an in-patient drug program at Berkshire Woods. She did not enter the program.
The mother entered Crossroads for the second time on April 11, 1989 and was discharged one month later, on May 12, 1989, for non-compliance. Thereafter, the mother did not enter or participate in any drug rehabilitation program.
The mother was incarcerated at Niantic from August 29, 1989 to November 28, 1989 and again from June 20, 1990 to July 30, 1990. The mother admitted that she was not employed; admitted that she did not engage in therapy and did not successfully complete any drug program. The mother did not remain drug-free and in fact, by her own admission, on October 12, 1990 was scheduled to enter detox yet again.
The mother did maintain contact with her child when Lauren visited with her grandmother, although, the mother expressed problems with such visits to the social worker. The social worker agreed to schedule supervised visits for the mother on several occasions, but the mother never followed through with those requests. The mother did not provide gifts or cards to the child for birthdays and holidays, except for some balloons. The mother did not visit Lauren at the foster home, or go to the foster home, at least for the past two years. The mother called the foster mother once. The mother did not provide any support for the child during her entire time in foster care.
The mother failed to maintain regular contact with DCYS or the foster family. The mother would often disappear for months at a time and never called DCYS on a weekly basis, as was requested. She never followed through with requests for supervised visits and failed to comply with social service agreements.
6. C.G.S. 17-43a(d)(6). In considering the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent, the CT Page 2163 court finds: that there is no identified father, and so Ms. Frangione was not prevented from maintaining a relationship with Lauren by Lauren's unknown father.
Ms. Frangione was never prevented from seeing Lauren by DCYS. She could always see Lauren when Lauren was at her grandmother's home for a visit. And DCYS was always willing to set up visits for Ms. Frangione if she so requested, but she never followed through on those requests.
Ms. Frangione has not expressed any economic problems that would have kept her from seeing Lauren.
Taking all required factors into account, the court concludes that the petition for the termination of parental rights has been proved by clear and convincing evidence to be in the best interest of the child. A termination is therefore ordered of the parental rights of Barbara Frangione in and to her minor child, Lauren.
Pursuant to Connecticut General Statutes, 17-43a(f), it is further ordered that the Commissioner of DCYS be appointed statutory parent so that Lauren can be placed in adoption. DCYS is required to submit reports to the clerk of the court within ninety days of the date of this judgment and every six months thereafter until the adoption of Lauren is finalized.
Judgment may enter accordingly.
COCCO, JUDGE